John P. Stigi, III
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701
jstigi@sheppardmullin.com

*Attorneys for Plaintiff Walter F. Jones*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALTER F. JONES,<br><br>Plaintiff,<br><br>-against-<br><br>THE J.G. WENTWORTH COMPANY and STEWART STOCKDALE,<br><br>Defendants. | Case No. ________________<br><br>ECF Case<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Walter F. Jones ("Jones"), by and through his attorneys, Sheppard, Mullin, Richter & Hampton LLP, as and for his Complaint against defendants The J.G. Wentworth Company ("JGW") and Stewart Stockdale ("Stockdale"), alleges, upon knowledge as to his own acts, following review of publicly filed documents and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This is a lawsuit by plaintiff Jones against defendants for violations of Sections 10(b) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), fraud, negligent misrepresentation and breach of the duty of good faith and fair dealing. These claims for relief arise out of defendants' sale of JGW securities to Jones while defendants were in

possession of material non-public information, and misrepresentations and omissions of material fact, regarding JGW's business and in connection with a Stock Purchase Agreement ("Agreement"), executed on March 6, 2015, by and among JGW, Jones, WestStar Mortgage, Inc. ("WestStar"), Kathleen Murphy-Zimpel and Roger W. Jones (collectively, the "Parties"), and the associated transaction consummated on July 31, 2015 (the "Transaction"). Defendants possessed material non-public information regarding JGW's business, unknown to Jones, when they sold JGW stock to Jones, and misrepresented, concealed and omitted material facts regarding JGW's business in order to induce Jones to agree to close the Transaction five days before JGW's quarterly earnings announcement on August 5, 2015. During its quarterly earnings call the next day, JGW officers and employees revealed knowledge of material non-public information they knew but failed to disclose to Jones prior to the sale of JGW stock to Jones and the closing of the Transaction. Following the quarterly earnings announcement, the value of JGW's stock declined sharply, eventually rendering all but worthless 25% of the agreed-to consideration paid by JGW to Jones and the other purchasers of JGW stock for their WestStar stock. As a result of defendants' course of conduct, Jones suffered damages. Accordingly, Jones brings this action against defendants for necessary and appropriate relief.

## PARTIES

2. Plaintiff Jones is an individual and a resident of Florida.

3. Defendant JGW is a diversified financial services company that purports to specialize in providing direct-to-consumer financing solutions, including structured settlement payment purchasing, mortgage origination, prepaid cards, and access to personal lending. JGW is incorporated under the laws of the State of Delaware. JGW has a principal place of business at 201 King of Prussia Road, Suite 501, Radnor, Pennsylvania 19087-5148.

4. Defendant Stockdale is and was, during the relevant time period, the Chief Executive Officer of JGW. Upon information and belief, Stockdale is a resident of Connecticut.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action arises under the laws of the United States. Additionally, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the claims are entirely between citizens of different states and the amount in controversy exceeds $75,000.

6. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Jones' pendent claims for fraud, negligent misrepresentation and breach of the duty of good faith and fair dealing.

7. This Court has personal jurisdiction over JGW, and venue is appropriate, due to the contractual agreement between the Parties that all actions arising out of or relating to the Agreement shall be heard and determined in any federal court sitting in the Borough of Manhattan of the City of New York.

## FACTUAL ALLEGATIONS

### A. The Parties Enter Into the Agreement

8. In 2000, Jones founded WestStar, a privately-held residential mortgage company.

9. On March 6, 2015, the Parties executed the Agreement through which, *inter alia*, JGW agreed to acquire all of the stock of WestStar, agreeing to pay the sellers of WestStar stock, including Jones, Kathleen Murphy-Zimpel and Roger W. Jones (the "Sellers"), a total of $54 million (the "Purchase Price") in consideration for their WestStar stock (referred to above as the "Transaction").

**The Purchase Price**

10. Pursuant to Article II, Section 2.4, of the Agreement, the amount to be paid by JGW to the Sellers for their WestStar stock was to be comprised of either all cash or a combination of both cash and JGW stock.

11. The Parties heavily negotiated the proportion of cash to JGW stock, with JGW pushing to have the stock portion of the consideration be as large as possible.

12. Jones and the other owners of WestStar stock ultimately agreed to JGW's demand that JGW stock would account for as much as 25% of the Purchase Price, at JGW's election, but that JGW could elect to pay up to 100% of the Purchase Price in cash.

**The Closing Date**

13. Article II, Section 2.2, of the Agreement, addressing the closing of the Transaction, did not set a specific calendar day for the closing. Instead, the Closing Date was set to be two (2) business days following the satisfaction or waiver of conditions set forth in Article IX of the Agreement. One such condition, set forth in Article IX, Section 9.3, was that the Securities and Exchange Commission ("SEC") shall have declared effective the registration statement submitted by JGW registering the shares being sold to Jones and the other Sellers (the "Registration Statement"), with such effectiveness continuing at and as of the Closing Date.

**JGW's Obligation to Provide Information Regarding Buyer Material Adverse Effects**

14. The Preamble to the Agreement establishes that, as used in the Agreement, the term "Buyer" refers to JGW.

15. Because there was a possibility that Jones would become an investor in JGW in the event a portion of the Transaction consideration was paid in JGW stock, Jones and

the other Sellers sought to be informed about JGW's business prior to the execution of the Agreement, and through the expected closing of the Transaction.

16. For example, Article I of the Agreement defines "Buyer Material Adverse Effect" as "any Event (i) that has had or would reasonably be expected to have, individually or in the aggregate, a material and adverse effect upon the business, assets, liabilities, financial condition or operating results of Buyer on a consolidated basis," but excluding "any Event attributable to (A) changes in the economy or financial, capital or securities markets, including, without limitation, any disruption thereof and any decline in the price of any security (including the JGW Stock) . . . ." The definition further explains that such an exclusion only applies "so long as such matter does not have a materially disproportionate effect on Buyer relative to other comparable entities operating in the industry in which Buyer operates."

17. According to Article V of the Agreement containing representations and warranties of JGW, JGW represented and warranted as of the Closing Date that "[s]ince the date of filing of [JGW's] latest report on Form 10-Q, [JGW] has not suffered a Buyer Material Adverse Effect."

18. As of the Closing Date, JGW had last filed a quarterly report on Form 10-Q on May 11, 2015.

**B. JGW Intentionally Misrepresents and Fails to Disclose Material Facts Regarding its Business, Targets a Closing Date and Reveals it Will Pay the Purchase Price with Both Stock and Cash**

19. At various times between the execution of the Agreement and the Closing Date, defendants provided reassurances to Jones that JGW's business was sound and that its stock price was strong.

20. For example, during lunch meetings in June 2015, JGW (through Stockdale and other JGW personnel) communicated to Jones that JGW was planning to pay the

acquisition consideration completely in cash because, as they indicated, JGW's stock price was strong.

21. From the day the Agreement was signed on March 6, 2015 through late-July, JGW made no effort to target a specific closing date.

22. Then, in late-July, JGW became adamant that the Parties target a Closing Date of Friday, July 31, 2015. JGW provided no reason for its abrupt posture that this specific date be targeted, just before its second quarter earnings announcement. From that point until the Closing Date, JGW applied tremendous pressure to close the deal as quickly as possible, prior to its second quarter earnings announcement. At this time, Stockdale also spoke to some members of JGW's senior management regarding the need to close before the earnings call. Further, on July 28, 2015, JGW filed an "Acceleration Request" with the SEC requesting that it accelerate the effectiveness of the Registration Statement so that it would be deemed effective no later than Thursday, July 30, 2015, or as soon thereafter as practicable. This declaration of effectiveness was a condition to closing under Article IX of the Agreement. On July 30, 2015, the SEC issued a Notice of Effectiveness with regard to the Registration Statement.

23. Similarly, from the date the Agreement was signed through late-July, JGW made no commitment to satisfying the Purchase Price in either all cash or with a cash-stock mix.

24. On July 27, 2015, counsel for Jones inquired of counsel for JGW whether the Transaction would be cash-only.

25. Then, on July 28, 2015, three days before the Closing Date, JGW announced for the first time that it determined it would issue 25% of the Purchase Price in JGW stock — the maximum amount that could be allocated to stock under Article II, Section 2.4 of the Agreement — and the remaining 75% in cash.

26. During the more than four-month period between execution of the Agreement and late-July, there was no aggressive pressuring by either party to set a Closing Date and establish the form of consideration JGW would provide in exchange for WestStar stock. Then, within a very condensed period of time in late-July, JGW suddenly targeted and pressed for an imminent Closing Date and announced that it would pay the maximum 25% in stock and the remainder of the Purchase Price in cash.

27. On July 31, 2015, the Transaction contemplated by the Agreement closed, and JGW paid the Purchase Price (75% in cash, 25% in JGW stock) to Jones and the other Sellers of WestStar stock. That day, JGW's stock closed at $8.24 per share.

28. On August 6, 2015, JGW's stock opened at $7.99 per share. At 10:00 am Eastern Time, JGW gave its second quarter 2015 earnings announcement and held its investor conference call.

a. At the conference call's outset, Stockdale explained that reported results were heavily impacted by an interest rate environment that led to a rapid increase in JGW's cost of funds for the quarter. He added that JGW had instituted adjustments to its pricing and product strategy, but stated that there is a "lag between when we price a deal with the appropriate purchase yield and when we fund a deal and ultimately securitize the pool of assets."

b. John Schwab, JGW's Chief Financial Officer, stated that total revenue was $61.4 million, down 50% from the prior year, primarily due to an increase in JGW's "cost of funds during the second quarter of 2015 as compared to the second quarter of 2014," adding that the second quarter was "impacted by rising rates, which was particularly acute in the last month of the quarter when rates rose approximately 25% in less than 30 days." Schwab

explained that JGW had raised its purchase yields to combat rising rates, but "rapid changes cannot be quickly fixed."

c. In response to an analyst question regarding how much JGW was raising yields to counteract the increase in cost of funds, Stockdale stated that he could not tell him "how much we're actually raising rates. ***It's fair to say that when we saw the huge spikes a couple months ago, okay? It wasn't like yesterday.*** We started taking action." (emphasis added). Stockdale added that JGW had "started taking action quite a few weeks ago, and it's been fairly significant." He admitted, "we were surprised by the rapid increase in rates," but "took . . . immediate action." Stockdale explained that it would take time before they would be able to see the effect of the steps JGW took to counteract the cost of funds' impact on their business.

d. In response, the analyst stated that given "the fact that you are a public company, I don't understand why there's a discussion and a thought process about interest rate hedging. It seems like it should be a requirement that you should be funding forward at least the amount of time lag that you're talking about."

e. Stockdale described the analyst's series of observations as a fair one, and said that "in the first quarter [of 2015], we benefited by the rate movement, and we've been benefiting from the rate movements for many quarters. So, yes, this is the first time in a long time that we get hurt by it, and . . . it's something that we are actively looking at."

f. In further response to the analyst's point, Schwab stated "while we do have the ability to price to combat rising rate environments, we don't have the ability to handle abrupt ones."

g. Referencing the environment in which increased interest rates had been expected for some time, another analyst asked why JGW was looking into hedging strategies "now as opposed to 12 months ago," noting that it seemed like JGW was "a little behind the ball on this."

h. Schwab responded "we look at this on a very regular and continual basis," adding that JGW had "been mindful of this for a long period of time." Schwab stated that "hindsight is very good, as we sit here today and look at the market, again, had we hedged this out and say we wanted to be protected into 2015, we could have locked ourselves up" in connection with a securitization.

i. In response to a related question, Schwab again emphasized that "in a rising rate environment . . . [JGW] manage[s] that through the buy rate or the purchase yield." However, he added that it "gets more difficult and more tricky . . . when there are abrupt changes of very quick changes that you can't react to because it takes some time to work that through the system." He underscored that "it's these abrupt changes that cause a big swing in profitability if it happens at the wrong time. And frankly, that's what we saw happening."

j. Later in the call, Schwab stated "you know, we got bit, yes, we get it, we will all look back and argue whether we could have raised rates earlier or whether we could have hedged and those are all really valid points."

29. Following the earnings call, JGW's stock experienced a sharp decline of 24%, closing at $6.08 on August 6, 2015. JGW's stock failed to close above $6.20 per share from that point forward, and ultimately fell to $0.45 per share on June 17, 2016 — ***a 94% drop from the date of the closing of the Transaction*** — after which the New York Stock Exchange suspended trading in the stock due to JGW's failure to maintain an average global market

capitalization over a consecutive 30-day trading period of at least $15 million. On December 27, 2016, JGW's stock, trading on the OTCQX Market, closed at $0.40 per share. This decline in JGW's stock price following its earnings announcement was caused in full or in part by the disclosures in that announcement of previously undisclosed material non-public information that was known to JGW and Stockdale at the time of the Transaction.

30. In a news release on August 5, 2015, JGW stated for the first time that it had chosen to take price actions to mitigate the rapid increase in cost of funds realized during the second quarter of 2015. JGW cited a net income loss of $26.6 million as compared to a positive net income of $21.7 million in the second quarter of 2014, attributing the ***$48.3 million downward swing*** in net income primarily to an increase in JGW's cost of funds, which impacted JGW's unrealized gains, receivables, long term debt, and derivatives. The news release also revealed an adjusted net income loss of $2.3 million, as compared to positive adjusted net incomes of $17.2 million in the second quarter of 2014 and $8.2 million in the first quarter of 2015.

31. Defendants knew that JGW had benefited from favorable movements in interest rates leading up to the first quarter of 2015 during which the Agreement was executed, but was harmed by unfavorable movements in the second quarter of 2015.

32. Defendants admitted that they were aware of a rapid increase in JGW's cost of funds months prior to the Closing Date and its August 6, 2015 conference call.

33. Defendants adjusted JGW's pricing and product strategy in response to a rising interest rate environment, but were aware that JGW lacked the ability to handle the abrupt changes in rates it experienced. That inability gave rise to an unchecked negative impact on the financial condition of the company, including a 50% drop in revenue from the prior year, that

was reflected in JGW's second quarter financial results, revealed to the public on August 5, 2015.

34. Therefore, while defendants were conveying to Jones that JGW's business was solid, the business was in fact suffering due to JGW's inability to counteract rapid increases in interest rates and cost of funds, which it knew had a materially negative impact on its business and the financial results it would disclose on August 5 and 6, 2015. These matters were not attributable to changes in the economy or financial, capital or securities markets, as they arose from defendants' affirmative business decisions prior, and in response, to a rise in cost of funds.

a. Prior to the rise in rates, defendants elected to take advantage of favorable rates without engaging in interest rate hedging, despite the fact that as a lender, JGW's business model was acutely linked to prevailing rates, which affect the cost at which JGW can access funds and charge customers for borrowing JGW's funds, which in turn affects critical aspects of JGW's financial statements, including revenue and net income.

b. After the rise in rates and cost of funds, which defendants were aware of for "months," defendants still did not engage in interest rate hedging, but responded by adjusting JGW's pricing and product strategy, which defendants knew would have a delayed remedial effect, if any, such that the negative business and financial effects of their decisions would be realized in JGW's second quarter earnings report.

c. Even if these matters were attributable to the economy or financial, capital or securities markets, defendants' decisions caused a materially disproportionate effect on JGW relative to comparable public company lenders, who engage in interest rate hedging to protect against such movement in interest rates and cost of funds to which their business models are acutely susceptible.

35. Defendants had a duty to disclose to Jones prior to the Closing Date that JGW's business was suffering to such an extent that defendants knew or should have known that JGW's stock price would decline materially after release of quarterly results and earnings announcements on August 5-6, 2015.

36. Defendants' misrepresentations and omissions were misleading to Jones. Had he known of the true facts at the time of the closing, he would have been able to take steps to avoid or mitigate some or all of the impact and losses suffered by the precipitous and continued drop in the value of JGW stock almost immediately after the closing of the Transaction. This decline in JGW's stock price was caused by the defendants' disclosure on August 5-6, 2015 of previously undisclosed material non-public information that the defendants were aware of when they elected to sell JGW stock as 25% of the consideration paid to the Sellers in lieu of cash, pressed for a July 31, 2015 closing date, and consummated the Transaction. Jones relied upon the defendants omissions and misrepresentations in consummating the Transaction, sold his shares of JGW stock at the resultant decreased values and, as a result, incurred substantial losses.

37. Jones and the other Sellers fully performed their obligations under the Agreement, but did not receive the full and expected benefit of their bargain due to the intentional misrepresentations and omissions of defendants.

**FIRST CLAIM FOR RELIEF**
**(Violations of Sections 10(b) and 20A of the Exchange Act as against JGW)**

38. Jones repeats and realleges the allegations contained in paragraphs 1 through 37 of this Complaint as though fully set forth herein.

39. JGW elected to, and did in fact, sell JGW stock as 25% of the consideration paid to the Sellers, including Jones, in exchange for their WestStar stock.

40. At the time JGW elected to sell JGW stock to Jones, JGW was in possession of material non-public information regarding those securities. Specifically, as set forth above, JGW possessed material non-public information regarding its business and financial condition that would, when disclosed, have a negative impact on the value of JGW stock.

41. JGW had a duty to either disclose this material non-public information to Jones or to abstain from selling JGW securities to Jones while such inside information remained undisclosed.

42. While in possession of this material non-public information, JGW sold JGW stock contemporaneously with Jones' purchase of that stock, without disclosing to Jones the material non-public information in its possession regarding JGW, for JGW's benefit in gaining profits or avoiding losses.

43. JGW thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

44. The aforesaid acts of JGW caused Jones damages in an amount to be determined at trial, but not less than $7 million.

**SECOND CLAIM FOR RELIEF**
**(Violations of Sections 10(b) and 20A of the Exchange Act as against Stockdale)**

45. Jones repeats and realleges the allegations contained in paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46. As set forth above, JGW sold its securities contemporaneously with the purchase of those securities by Jones while JGW was in possession of material non-public information that it failed to disclose, in violation of Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

47. Stockdale, as Chief Executive Officer of JGW, knew and was in possession of the material non-public information regarding JGW's business and financial condition discussed above that JGW withheld when it elected to sell, and ultimately sold, JGW stock to Jones and the Sellers of WestStar stock as 25% of the Purchase Price.

48. Stockdale had a duty to either disclose this material non-public information to Jones or to abstain from selling JGW securities to Jones while such inside information remained undisclosed.

49. Stockdale, in response to inquiries by Jones, intentionally misrepresented, omitted, and concealed material facts regarding JGW's business and financial condition.

50. While in possession of this material non-public information, Stockdale executed the Agreement on behalf of JGW, and ultimately directed the consummation of the Transaction without disclosing to Jones the material non-public information.

51. By virtue of his function or status, Stockdale in fact exercised control over JGW in connection with the Agreement, Transaction and withholding of material non-public information.

52. Stockdale was therefore a controlling person under Section 20A of the Exchange Act.

53. By virtue of the foregoing, pursuant to Section 20A(b)(3), Stockdale is liable under the First Claim for Relief above.

**THIRD CLAIM FOR RELIEF**
**(Fraud as against Defendants)**

54. Jones repeats and realleges the allegations contained in paragraphs 1 through 53 of this Complaint as though fully set forth herein.

55. As set forth above, defendants made materially false statements and omitted material facts in communications with Jones with the intent to defraud Jones and induce Jones to consummate the Transaction.

56. Defendants had a duty to disclose to Jones prior to the closing of the Transaction on July 31, 2015, material nonpublic information regarding JGW.

57. Jones reasonably relied upon defendants' statements and omissions to his detriment when he agreed to consummate the Transaction on July 31, 2015.

58. The aforesaid acts of defendants caused Jones damages in an amount to be determined at trial, but not less than $7 million.

**FOURTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation as against Defendants)**

59. Jones repeats and realleges the allegations contained in paragraphs 1 through 58 of this Complaint as though fully set forth herein.

60. Defendants had a duty to disclose to Jones prior to the closing of the Transaction on July 31, 2015, material nonpublic information regarding JGW.

61. Defendants owed Jones a duty to speak with care due to the relationship of the Parties that arose out of the Agreement, whereby each party had the right to rely upon the other for information.

62. In breach of these duties, defendants misrepresented and omitted material information regarding JGW's business conditions.

63. These misrepresentations and omissions were made by persons who possessed expertise with regard to the information they provided Jones, and were aware that Jones was relying upon the information they provided in connection with the consummation of the Transaction.

64. Jones justifiably relied on these misrepresentations and omissions in consummating the Transaction to his detriment.

65. As an actual, proximate and foreseeable result of defendants' misconduct, Jones has been damaged in an amount to be determined at trial, but not less than $7 million.

**FIFTH CLAIM FOR RELIEF**
**(Breach of the Duty of Good Faith and Fair Dealing as against JGW)**

66. Jones repeats and realleges the allegations contained in paragraphs 1 through 65 of this Complaint as though fully set forth herein.

67. JGW was obligated under the Agreement to act in good faith to allow Jones to receive the benefit of his bargain under the Agreement.

68. JGW breached its duty of good faith and fair dealing by intentionally providing material misrepresentations and concealing and omitting material facts in response to Jones' requests for information regarding JGW's business in bad faith.

69. JGW's misrepresentations, concealment and omissions injured Jones' right to receive his benefit of the bargain in that Jones justifiably believed and relied upon the information he was provided in determining fair consideration for his shares in WestStar. However, his understanding of the value of that consideration was greater than the actual value he would be receiving, since negative information regarding JGW's business and financial condition that rendered the consideration he would be receiving significantly less valuable, was misrepresented, concealed or omitted by JGW.

70. Jones has been damaged and will continue to be damaged in an amount to be determined at trial, but not less than $7 million.

**PRAYER FOR RELIEF**

WHEREFORE, Jones requests judgment against the defendants and an order granting the following relief:

A. Damages in an amount to be determined at trial, but not less than $7 million, plus interest;

B. Costs, disbursements, punitive damages, reasonable attorneys' fees; and

C. Such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Jones demands a trial by jury of all issues so triable.

Dated: New York, New York
December 29, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: /s/ John P. Stigi III
John P. Stigi III (JS 1565)

30 Rockefeller Plaza
New York, New York 10112
(212) 653-8700
(212) 653-8701 (fax)
jstigi@sheppardmullin.com

*Attorneys for Plaintiff Walter F. Jones*